**April Menise GANT, Appellant,**

v.

**Frank GANT, Jr., Respondent.**

**No. WD 48978.**

Missouri Court of Appeals,
Western District.

Feb. 7, 1995.

David L. Neuhaus, Kansas City, for appellant.

Cynthia Regina Powers, Kansas City, for respondent.

Before FENNER, C.J., and HANNA and STITH, JJ.

STITH, Judge.

April Menise Gant appeals the child custody provisions in the decree dissolving her marriage to Frank Gant, Jr. That decree provided for joint legal custody of the Gants' two children, a son age three years and a daughter just under one year. Under the decree, Mr. Gant received primary physical custody; Mrs. Gant, who had moved to Minnesota, received one week of visitation at six-week intervals. Mrs. Gant raises points disputing the custody and visitation determinations. She further argues that the trial court erred as a matter of law in failing to enter written findings as to the children's best interests or as to the occurrence of domestic violence, in contravention of the specific requirements of subsections

452.375.2(5), .11, RSMo Cum.Supp.1993 that such findings be made.[1]

We find the latter argument dispositive and remand for a determination of whether domestic violence or a pattern of such violence occurred and, if so, for a redetermination of custody and visitation issues. If the court again determines to give custody to Mr. Gant, the court should support its determination by making specific findings of fact and conclusions of law explaining the rationale for its decision as required by section 452.375.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

It is not claimed that Mr. Gant was ever abusive toward the Gants' children. Nor did Mrs. Gant claim, in her Petition for Dissolution, that her husband had been abusive or violent toward her during their marriage. At the dissolution hearing, however, Mrs. Gant did offer evidence, without objection, that Mr. Gant had physically and mentally abused her and that he was mentally unstable. She claimed that Mr. Gant was an unfit custodian for the children because of his violent nature and emotional instability.

In support of her claims of violence and mental instability, Mrs. Gant testified that Mr. Gant had repeatedly threatened to kill her and had physically abused her prior to and during the marriage. She referred generally to his grabbing her and smacking her. She also related several examples of abuse that arose during arguments. She testified that, on one occasion, Mr. Gant grabbed her, ripped her clothing, and poked her in the eye, breaking a blood vessel. She also testified that the prior June, after they had separated, he had grabbed her by the face and squeezed as he pushed her over the arm of the couch while she held their six-month-old daughter and had told her that she made him want to kill her. While the threat was not acted upon, Mrs. Gant testified that she was afraid of her husband.

As additional evidence of Mr. Gant's violence and instability, Mrs. Gant testified

about other incidents which had occurred earlier that she said made her fear for her own safety and for her children's safety. Mrs. Gant recounted that Mr. Gant often became enraged during arguments, particularly prior to and in the early years of the marriage. On one occasion, he picked up a baseball bat and destroyed his own watch. Mrs. Gant bought him a second watch, but during a 1991 argument he smashed it with the bat. In separate incidents, he also smashed and destroyed his own boombox with the baseball bat, cut up his own hat, and pushed the television over, causing it to hit and create a hole in the wall. Mrs. Gant noted that Mr. Gant instigated fist fights with at least two men. Mrs. Gant also related that Mr. Gant had threatened to kill himself throughout the marriage.

In his testimony, Mr. Gant acknowledged the occurrence of most of the incidents related by Mrs. Gant. However, he suggested that most of them had occurred prior to or early in the marriage and that they had been exaggerated by his wife. He also claimed that Mrs. Gant had admitted at her deposition that the "eye-poking" and couch incidents were the only incidents which involved physical violence toward Mrs. Gant. He testified that the eye-poke was an accident and that Mrs. Gant was never seriously injured.

However, on cross-examination Mr. Gant further admitted the following regarding the "eye-poking" incident:

Q. Frank, let me ask you about this. Now, didn't you, when you poked her in the eye, you guys were having an argument, weren't you?

A. Yes, we were.

Q. And you reached out and you grabbed ahold of her gown, didn't you, Frank?

A. No, I did not. I attempted to grab hold of her gown.

Q. Attempted to grab ahold of—

A. And my finger, by her head moving down or something, accidentally poked her in the eye.

1. All statutory references are to the 1993 Cumulative Supplement to the Revised Statutes of Missouri, unless otherwise indicated.

Q. You didn't tear her gown Frank?

A. It tore this part or something.

Q. So the gown was torn?

A. The gown was torn.

Q. Okay. Do you think she wanted you to touch her like that, Frank?

A. No, she did not.

. . . .

Q. Physically when you were trying to grab her? Don't you think she was afraid, Frank?

A. I assume.

Mr. Gant further agreed that, during the "couch" incident in June of the year of the divorce, he had "grabbed her face and pushed her around your house." He further described the incident, and his threat to kill her, as follows:

Q. . . . you grabbed her by the face?

A. Yes, and tilted her back?

Q. And tilted her back?

A. Yes.

Q. And shoved her back on the couch?

A. No, I did not shove her back. I tilted her back. There is a difference.

Q. Let me ask you this. Do you think that she wanted you to put your hand on her face?

A. No, she did not.

. . . .

Q. Do you think she was scared of you, Frank, when you put out your hand? Put out your hand. Frank, you've got a huge hand.

A. About the size of yours.

Q. Its bigger. You think that scared her when you had ahold of her face, Frank?

A. I'm sure it did.

Q. Do you think she was afraid you were really going to hurt her bad, Frank?

A. No, I do not believe that.

Q. You told her, Frank, didn't you tell her that you wanted to kill her, Frank?

A. No I did not. I said, "April, sometimes you make me want to kill you." Yes, I did say that.

. . . . .

Mr. Gant minimized the seriousness of the incidents of violence toward household objects such as the television, the alarm clock, and so forth, suggesting they were all just property and did not involve assaults on her. However, he admitted he had smashed the alarm clock and the second watch within the preceding few years. He also admitted that he was a very large man, weighing 230 pounds, and that he was much larger than his wife. When asked, "You take a 32-ounce bat when you're having an argument with her and you start smashing up things around her, do you think that would scare her, Frank," Mr. Gant admitted, "I think it would scare her some." He claimed he did not want to scare her, but that he just wanted to hurt her feelings.

Mr. Gant further explained that his involvement in one of several fist fights was to defend Mrs. Gant. He admitted threatening to kill himself on numerous occasions, but said that he did not mean it and had mentioned killing himself simply to get Mrs. Gant's attention and affection.

Mr. Gant maintained he had matured since the time of these incidents. He also noted that there was no evidence he had ever hit his wife or bruised her, that she had never reported him to the police, that he had never acted violently toward the children, and that he had been very involved in the children's upbringing. He also offered evidence, including the testimony of the children's nanny, in support of his claim that Mrs. Gant would not be a proper person to provide primary care of the children and that he would be a good primary care-giver.

## II. THE LAW REQUIRES FINDINGS OF FACT IN CASES INVOLVING DOMESTIC VIOLENCE

The key issue before this Court is whether, in light of this evidence, the trial court was required to make a determination on the record as to whether domestic violence, or a pattern of domestic violence, had occurred, and, if so, to make findings of fact and conclusions of law explaining why an award of custody to the abusive parent was in the best interests of the children.

■ We find that the trial court was required by subsections 452.375.2(5) and .11 to make a record determination as to whether domestic violence had occurred. These subsections, which deal with child custody and visitation, were amended by the legislature in 1993 to require consideration of "domestic violence" in making determinations as to child custody and visitation rights. Those provisions state as follows:

2. The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:

. . . .

(5) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm[.]

. . . .

11. If the court finds that domestic violence has occurred, the court shall make specific findings of fact to show that the custody or visitation arrangement ordered by the court best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm.

Section 452.375 does not define "domestic violence," but the meaning of that term is explained in the text of section 452.400. That provision states that, in considering whether to grant visitation rights to a spouse found to have committed domestic violence, the court shall consider:

the parent's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault on other persons. . . .

§ 452.400(1). This definition is consistent with the definition of "domestic violence" in section 455.200(2) of the Adult Abuse Act, which provides for funding for shelters for victims of domestic violence.[2]

Compliance with the requirements of subsections 452.375.2(5) and .11 is mandatory, not discretionary. The legislature stated in section 452.375.2(5) that the court must determine whether there is a pattern of domestic violence and that, if the court nonetheless decides to award custody to the abusive parent, the court "*shall* enter written findings of fact and conclusions of law" (emphasis added) to support its custody determination. Similarly, in section 452.375.11, the legislature stated that, if the trial court finds that any domestic violence occurred, whether or not part of a pattern of domestic violence, then the trial court "*shall* make specific findings of fact" (emphasis added) to show that the custody or visitation arrangement ordered by the court "best protects the child and the parent or other family ... member" from harm.

As is evident, the mandatory nature of the changes enacted by the legislature reflects its concern with the problem of domestic violence, and its resolve that the trial court should consider the existence and history of such violence before making its determination of child custody and visitation.

■ The extent of the legislature's concern with domestic violence is further reflected in related amendments which the legislature passed at the same time that it amended section 452.375. For example, it amended section 452.400 to require that domestic violence be considered in determining visitation rights of a non-custodial parent. It also amended sections 452.375.8 and 452.376.1 to require that a parent found to engage in domestic violence not be given access to the child's address records. These changes again reflect the legislature's concern that domestic violence be strongly con-

2. The latter provision defines "domestic violence" as "attempting to cause or causing bodily injury to a family or household member, or plac- ing a family or household member by threat of force in fear of imminent physical harm." § 455.200(2), RSMo 1986.

sidered in determining custody and visitation matters.[3]

### III. *SHOULD THE TRIAL COURT HAVE MADE A SPECIFIC DETERMINATION ON THE RECORD BELOW AS TO WHETHER DOMESTIC VIOLENCE OCCURRED?*

The parties agree that the trial court did not enter any findings of fact or conclusions of law concerning why it believed that primary physical custody of the children should be given to Mr. Gant and why Mrs. Gant should be permitted visitation of only one week every six weeks. They disagree as to whether such findings were required.

■ Opposing the necessity of findings, Mr. Gant notes that no party requested the trial court to make findings and that the judge did not make any finding or otherwise suggest that he believed domestic violence had occurred. Mr. Gant argues that Rule 73.01(a) is thus applicable. That rule states that, where neither party requests that specific findings be made, all fact issues on appeal must be considered as having been found in accordance with the result reached by the trial court. Thus, he would have us imply a finding of no violence from the judge's silence. Mr. Gant further relies on the presumption that the trial court reviewed all evidence and determined custody in the children's best interests.

Mrs. Gant, on the other hand, notes that section 452.375 specifically states that findings must be made if the court believes domestic violence or a pattern of domestic violence occurred without regard to whether either party requests that findings be made.

■ We agree that the specific statutory requirement of findings obviates the need for either of the parties to request the trial court to enter such findings and makes the presumption in Rule 73.01 inapplicable. Nonetheless, the statute still requires specific findings of fact and conclusions of law as to why custody was given to the allegedly violent parent only if the trial court believes that a pattern of domestic violence (under section 452.375.2(5)), or any domestic violence (under section 452.375.11), has occurred. The trial court's opinion did not state whether or not he believed domestic violence had occurred. Are we to infer from this silence that the trial court must not have believed that domestic violence occurred and thus saw no need to state a negative? Or should we infer that the judge was simply unaware that the then newly-enacted amendments required a determination as to whether domestic violence had occurred and required specific findings of fact and conclusions of law if custody were awarded to the allegedly violent parent?

■ Given the serious nature of domestic violence, its potential effect on victims of such violence and their families, and the concern expressed by the legislature that custody and visitation rights not be given to persons who have engaged in domestic violence absent a specific determination that such custody is in the best interests of the child and the family, and where, as here, there is substantial evidence in the record of domestic violence, we do not believe it is appropriate to assume, based merely on the court's silence, under the record herein, that the court did not believe that domestic violence, or a pattern of such violence, had occurred.

This case presents a good example of a situation in which such findings should be made. Even if Mrs. Gant's testimony were entirely discounted by the trial judge, Mr. Gant's testimony alone would require a finding that a pattern of violence occurred while the parties were living together prior to the marriage and that at least two, if not more, incidents of domestic violence occurred during the marriage itself.

On these facts, we will not presume from the trial judge's silence that he found that no domestic violence had occurred. *Cf. Basso v. Manlin,* 865 S.W.2d 431, 433 (Mo.App.1993)

---

**3.** A similar concern is reflected in the legislature's previous passage of the Adult Abuse Act. As the courts have previously noted, the latter was enacted in 1980 to underscore the prevalence of domestic violence and the need to protect victims of that violence. *See State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 226 (Mo. banc 1982); *Parkhurst v. Parkhurst,* 793 S.W.2d 634, 636 (Mo.App.1990).

(the presumption of findings in accordance with the result reached is defeated when the implicit findings present irreconcilable conflicts and inconsistencies). We believe that, given the gravity of this issue, the overarching concern for domestic violence expressed by the legislature, and the evidence of domestic violence in this case, it was mandatory for the trial court to indicate on the record whether or not the court believed that domestic violence had occurred. Therefore, while Mr. Gant offered explanations for his conduct and for his threats of violence to himself and also offered other evidence which, if accepted, might support award of primary physical custody to him, such an award could not be made without a specific explanation by the court as to the rationale for such a custody decision.

A similar rule has been applied by Missouri courts in implementing other statutes which contain mandatory language requiring that findings be made in domestic and juvenile proceedings. In those cases, failure to make mandatory findings results in remand for entry of the necessary findings. This occurs, for instance, if the trial court fails to make a finding as to whether the marriage is irretrievably broken in a dissolution action;[4] if a child support award departs from the Form 14 guidelines without making the mandatory finding that the amount so calculated would be unjust or inappropriate;[5] or if the trial court in a juvenile court proceeding regarding the treatment and the removal of a child or in a termination of parental rights proceedings fails to follow the statutory mandate that findings be entered.[6] Further, the dissolution decree must reflect that custody was determined in the children's best interests even when the parents stipulate to the custody provisions. § 452.375.2; *Distler v. Distler*, 877 S.W.2d 184, 185–86 (Mo.App. 1994).

■ For these reasons, we remand this case so that the trial court can enter a finding whether "domestic violence" occurred as that term is used in section 452.375.11. A

finding of domestic violence requires the entry of findings of fact as to the basis of the decision on custody and visitation regardless who is given primary custody.

The trial court should also determine whether a "pattern of domestic violence" occurred as that term is used in section 452.375.2(5). If so, and should custody again be awarded to the husband following review and application of the relevant factors under the statute, the judge should enter specific findings of fact and conclusions of law as required by section 452.375.2(5). We do not contemplate that the judge will be required to take additional evidence on the issues prior to making his determinations.

This case is remanded for further proceedings in accordance with this opinion.

All concur.

---

4. *See* § 452.320, RSMo 1986; *B.W. v. F.E.W.*, 562 S.W.2d 137, 139 (Mo.App.1978).

5. *See* § 452.340.8; Rule 88.01(e); *Davidson v. Davidson*, 872 S.W.2d 606, 607 (Mo.App.1994).

6. *See* §§ 211.181, 211.183, 211.447.2(3); *In re E.S.*, 851 S.W.2d 676, 681–82 (Mo.App.1993); *In re E.K.*, 860 S.W.2d 797, 799 (Mo.App.1993).